# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Delores J., *on behalf of* Q.J.J., Jr.<br><br>Plaintiff,<br><br>v.<br><br>Andrew Saul,[1]<br>Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 18-cv-1104 (HB)<br><br><br><br>**ORDER** |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Delores J., on behalf of minor Q.J.J., Jr.,

seeks review of the Acting Commissioner of Social Security's (the "Commissioner")

denial of the claimant's application for supplemental security income ("SSI").[2] *See*

*generally* (Compl. [Doc. No. 1].)  The parties filed cross-motions for summary judgment.

(Pl.'s Mot. for Summ. J. [Doc. No. 14]; Def.'s Mot. for Summ. J. [Doc. No. 16].)  For the

reasons set forth below, the Plaintiff's Motion for Summary Judgment will be denied and

the Commissioner's Motion for Summary Judgment will be granted.

---

[1]  Andrew Saul was sworn in as the Acting Commissioner of Social Security on June 17, 2019, and has been substituted pursuant to Federal Rule of Civil Procedure 25(d).

[2]  The Social Security Administrative Record ("R.") is available at Doc. No. 13.  For clarity, when citing to the record, the Court uses the pagination as marked in the record (on the bottom right of each page) rather than the CM/ECF pagination.

## I.    BACKGROUND

### A.    Procedural History

Claimant Q.J.J., Jr., was a seven-year old child when Plaintiff filed for SSI on his behalf on February 27, 2014. *See, e.g.*, (R. 194–202).  Plaintiff alleged the claimant was disabled due to ADHD, emotional behavior disorder, and asthma.  *See, e.g.*, (*id.* at 230.)  Plaintiff asserted an alleged onset date ("AOD") of June 15, 2011.  (*Id.*)

The ALJ issued an unfavorable decision on April 17, 2017.  (R. 19–48).  Pursuant to the three-step sequential evaluation procedure outlined in 20 C.F.R. § 416.924(a) for disability determinations for a minor seeking benefits, the ALJ first determined that the claimant had not engaged in substantial gainful activity since at least his AOD of June 16, 2011. (R. 23, 25.)  At step two, the ALJ determined that the claimant had severe impairments of "attention deficit hyperactivity disorder 'ADHD', anxiety disorder-not otherwise specified also classified as an adjustment disorder and asthma."  (*Id.* 25.)  The ALJ found at the third step that no impairment or combination of impairments met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (*Id.* 25–41).  He then considered whether the claimant's impairments functionally equaled Listing 112.11.  In that analysis, the ALJ considered six functional equivalence domains, as prescribed by 20 C.F.R. §§ 416.926a(g)-(l): 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) health and physical well-being.  (*Id.* 30–41.)

With respect to interacting and relating with others, the ALJ found the claimant had marked limitations.  (*Id.* 34.) As part of this analysis, the ALJ relied on statements from his teachers that he became easily frustrated and relied on adult support to deescalate.  (*Id.*)  The ALJ gave these statements great weight because they were consistent with and supported by substantial evidence.  (*Id.* 35.)  However, the ALJ found the claimant did not have marked limitations with respect to any other functional equivalence domain.  Thus, after considering the six functional equivalence domains, the ALJ concluded that "the claimant does not have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of function."  (*Id.* 41.)  As a result, the ALJ concluded the claimant's impairments did not functionally equal a listing, and he was therefore not disabled. (*Id.* 42.)

Specifically, and pertinent to the challenges raised by Plaintiff here, the ALJ found the claimant had no limitation in the domain of his ability to care for himself.  (*Id.* 38–40.)  In support of this determination, the ALJ concluded the claimant "had no problems with taking care of personal hygiene, caring for physical needs, or cooperating in taking medications."  (*Id.*  38.)  The ALJ also relied on statements from Plaintiff that the claimant was required to put his clothes away, take his dog out and take out the trash," and that the claimant "could dress himself, comb his hair, and tie his shoes." (*Id.* 38–39.)  The ALJ gave little weight to the opinions of claimant's teachers that the claimant had serious limitations in this area due to his inability to handle his frustrations properly, be patient when necessary, and respond appropriately to changes in mood.  The ALJ

explained that he gave those opinions little weight because these concerns were reflected in the ALJ's "findings of Attending and Completing Tasks and Interacting and Relating to Others as they appear to be closely related to claimant's ADHD diagnosis and treatment." (*Id.* 39.)

Plaintiff sought review by the Appeals Council, which denied her request. (R. 1–6). The ALJ's decision therefore became the final decision of the Commissioner. (*Id.*); *see also* 20 C.F.R. § 416.1481. Plaintiff then commenced this action for judicial review.

Plaintiff contends the ALJ erred in evaluating the claimant's impairments and in determining that the claimant is not disabled because, *inter alia*, "the ALJ never considered the highly supportive environment within which [the claimant] functioned and he cherry-picked evidence to support his findings." (Pl.'s Mem. in Supp. [Doc. No. 15 at 19].)

## B. Factual Background[3]

### 1. Plaintiff's Testimony

At a hearing before the ALJ, Plaintiff testified on behalf of the claimant. (R. 68–71, 82–84). Plaintiff, the claimant's grandmother and guardian, testified that she has been responsible for the claimant since he was five. (R. 68.) Plaintiff stated that clamant has problems staying on task at school, that he "got a new IEP" and they are

> trying to work something out inside his classroom and outside the
> classroom to kind of keep him focused but I did give them the authority to

_____

[3] The Court has reviewed the entire administrative record thoroughly, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

give him his meds in the morning and . . . before he comes home.  He has to have those to quiet him down.

(*Id.* 68–69.)  Plaintiff testified that the claimant takes five milligrams of Adderall twice a day—in the morning and after lunch. (*Id.* 69.)  Claimant takes a "special education bus" to and from school.  (*Id.*)  He has more issues in the morning than in the afternoon while on the bus.  (*Id.*)  In the morning, issues include "staying in his seatbelt," and "letting the windows down."  (*Id.*)  In the afternoon, "he quiets down after the medication," and when he comes home, "he kind of goes right to sleep."  (*Id.*)

Plaintiff also testified about a number of behavioral issues the claimant has exhibited at school.  She recounted confrontations with his teachers, one of which involved a call from the principal because "he was chasing the teacher through the classroom" and "[t]hey didn't know if he was serious or playing."  (*Id.* 70.)  His behavior has resulted in numerous suspensions and an expulsion.  (*Id.* 69.)  Plaintiff also testified that the claimant became "so angry at school that he head butted [sic] the wall and his tooth chipped."  (*Id.* 70.)

At home, Plaintiff and the claimant live with two of Plaintiff's other grandchildren. (*Id.*)  The claimant has demonstrated behavioral problems at home as well.  Plaintiff testified by way of example that he got very angry and punched the wall if he was frustrated about things that occurred at school.  (*Id.* 71.)

Regarding the claimant's impairments due to asthma, Plaintiff testified that the claimant had an asthma attack that led to a hospital visit in 2015, and that now he is on a steroid inhaler. (*Id.* 82.)

At the hearing, Plaintiff also responded to questions from the testifying medical expert, Michael Lace, Psy.D. (*Id.* 71–74.) In response to Dr. Lace's inquiries, Plaintiff testified that the claimant had not been hospitalized overnight for psychiatric reasons, he sees a one-on-one therapist every two weeks, and with the exception of when he punched the wall police have not been involved with the claimant. (*Id.*) Police were called in response to the wall-punching incident and the claimant was taken to Children's Hospital for physical treatment and evaluation. (*Id.* 74.)

## 2. Medical Expert Testimony

Dr. Lace testified before the ALJ to his opinion of the claimant's impairments. (*Id.* 74–82.) First, Dr. Lace opined that the record "describes attention deficit hyperactivity disorder." (*Id.* 74–75.) Dr. Lace also believed that the claimant presented with "an adjustment disorder, not otherwise specified or with anxiety or depression." (*Id.* 75.)

In terms of severity, Dr. Lace opined that the claimant's impairments did not meet the requirements of any of the Listings. (*Id.* 76.) In support, Dr. Lace pointed to the claimant's GAF scores in the mid-sixties to mid-seventies, although he acknowledged a GAF score of 44, which he considered to be an outlier. (*Id.* 75.) Dr. Lace also discussed the teacher questionnaires that were in the record but noted that "none of those noted

uniformly severe interactions with others." (*Id.*) Dr. Lace described the claimant's mental status exams which were "largely within normal limits," although he did admit that "some fidgeting [was] noted." (*Id.*) Dr. Lace also referred to physician treatment notes that stated the claimant was "doing well on current medications with good mental status and so forth." (*Id.*) In further support, Dr. Lace pointed to a notation in the record that the claimant should take "days off of the medication, especially in the summer to avoid tolerance build up and so forth." Finally, Dr. Lace mentioned that, in general, the claimant exhibited appropriate appearance, behavior, judgment, mood, affect, speech, eye contact, thought process, thought content, and was oriented to time, person, place, and place with his medical providers. (*Id.* 76.)

Dr. Lace also opined that the claimant's impairments were not functionally equal to any of the Listings. (*Id.* 77.) In support of this opinion, Dr. Lace discussed the six functional domains.

> [N]umber one, acquiring and using formation information, no limitation. His achievement testing and intelligence appears to be well within normal limits. Number two, attending and completing tasks. There is some evidence to support less than marked limitations in that regard. There is some fidgeting, some inattentiveness and some of that is secondary to the social challenges as well. Number three, interacting and relating with others, firmly into less marked realm. There are noted challenges in this regard with some problems at school and that one visit to the emergency room, as well as other examples at home and at school.
> . . . .
> Number four, moving and manipulating objects, no limitation. Number five, caring for yourself, no limitation [and] on number six, health and physical well being, no limitation.

(*Id.* 76–77.)

On questioning by Plaintiff's counsel, Dr. Lace stated that there is "a bit of a disconnect in the record that hasn't been . . . really addressed" concerning some of the claimant's objective tests and reporting of his in-class behavior. (*Id.* 81.) For instance, Dr. Lace believed that reports of the claimant's failure to remain on task were not consistent with other evidence in the record. (*Id.*) Dr. Lace believed that was because reports of the claimant's inability to stay on task were not consistent across the observation sessions. (*Id.* 81.) Dr. Lace also agreed with counsel that a consultative examination might be helpful "[i]f the Judge is interested in that." (*Id.* 82.)

### 3.     Relevant Medical Evidence

### a.     Medical Evaluations and Treatment

The record includes treatment notes from mental health care providers from the Wilder Foundation from July 2013 to August 2013. Those treatment records show GAF scores in the mid-sixties to mid-seventies, *see, e.g.*, (*id.* 478, 486, 517), although on two other occasions, the claimant had a GAF score of 44. *See, e.g.*, (R. 494, 509.)

On January 16, 2014, the claimant was evaluated by Susan Courneya, MA, LPC. (R. 532–42.) Ms. Courneya found the claimant to be calm and cheerful, alert, oriented x3, with normal speech, and having clear and relevant thought and perception. (*Id.* 536–37.) Based largely on Plaintiff's recitation of the claimant's history, Ms. Courneya diagnosed the claimant with Attention-Deficit/Hyperactivity Disorder, Combined Type, Generalized Anxiety Disorder, and Oppositional Defiant Disorder. (*Id.* 538.) Ms. Courneya recommended a combination of therapy and medication to manage these symptoms. (*Id.* 538–39.) After being prescribed Adderall for his diagnosed ADHD, both

Plaintiff and the claimant stated the medication was helping, and the claimant's father reported that the claimant asked for the medication. (*Id.* 512.)

On February 5, 2014, the claimant saw Nicole R. Vik, MD, and complained that the 5 mg tablet he was taking to moderate his ADHD was wearing off "and does not seem to be an adequate dose." (*Id.* 550.) Dr. Vik stopped the 5mg dose and instead prescribed a 10mg extended release of the same medication. (*Id.* 551.)

In an August 13, 2014, visit with Dr. Vik, Plaintiff stated that she stopped giving claimant his ADHD medication "due to stomach issues." (*Id.* 589.) Plaintiff also told Dr. Vik that even after she stopped administering the medication, the stomach issues have not gotten better. (*Id.*) Dr. Vik encouraged claimant to resume medication while in school, but that he should be returned to the clinic for follow-up if stomach issues or weight concerns persisted. (*Id.* 590.)

In an October 29, 2014, visit with Dr. Vik, Plaintiff reported to Dr. Vik that the medication the claimant was taking helped at school. (*Id.* 584.) Some side effects, including nausea were reported. (*Id.*) Dr. Vik noted that the claimant appeared fidgety, but his thought process, mood, speech, and eye contact were normal. Dr. Vik also prescribed ranitidine hydrochloride syrup as needed to address the claimant's nausea. (*Id.* 585.)

In a December 12, 2014, letter, Carol Mecklenburg, PhD, LP, noted that, as of the date of the report, she had seen the claimant for ten therapy sessions, which began on June 23, 2014. (*Id.* 599.) Dr. Mecklenburg noted that the claimant "has a history of traumatic events and he currently has a low threshold for perceiving threat in his

environment along with a tendency to react to perceived threat with anger and aggression." (*Id.*) Dr. Mecklenburg also opined that "[h]is difficulty with regulating his emotions and behavior have resulted in [the claimant] being placed in a special education environment for students with emotional/behavioral disorder." (*Id.*) Dr. Mecklenburg believed that his difficulty trusting others "is getting in the way of his successful performance of developmentally appropriate activities including school and social engagement with peers." (*Id.*) Dr. Mecklenburg did not opine as to the severity of these impairments in this letter, and instead provided a computer-based assessment using Plaintiff's report of claimant's behavioral issues. (*Id.* 559–612.) That said, in a June 27, 2014, clinical note, Dr. Mecklenburg assessed the claimant to have a GAF score of 70, suggesting only mild symptoms.[4] (*Id.* 613.)

On December 15, 2014, the claimant returned to Dr. Vik for a follow-up visit prompted by a trip to the emergency room for issues related to his asthma. (*Id.* 616). During this visit, a school episode was described in which the claimant threw a chair. (*Id.*) "[Plaintiff] admits [the claimant] was not taking a.m. dose" of his ADHD medication, and that she will start giving it to him as prescribed. (*Id.*) In her treatment notes, Dr. Vik "[s]tressed the importance of using his med[ication] as prescribed." (*Id.* 617.)

---

[4] Dr. Mecklenburg also submitted a letter on January 31, 2017, in which she noted that the claimant's "attendance at therapy was inconsistent with several late cancels and no-shows." (R. 694; *see also id.* 630–36 (Dr. Mecklenburg's progress notes including "no-show" notices).)

### b.     School Evaluations and Observations

On February 2, 2013, Linda Kallevang, a school psychologist, administered a "Behavior Assessment for Children-2, teacher and parent scale, Functional Behavior Assessment." (*Id.* 559.) The results of the test indicated that the claimant has "a[n] usually [sic] high number of aggressive behaviors that tend to be argumentative, defiant, and threatening." (*Id.* 559.) The claimant was also found to have "extreme difficulty adapting to changing situations and it takes [him] much longer to recover from a difficult situation[] than typical for his age." (*Id.*) For example, it was noted that the claimant

> will verbally threaten staff or classmates if he perceives someone touched
> him wrongly, said something he perceives as teasing, or looks at him in a
> way that he thinks is wrong. Once this occurs [the claimant] will not easily
> let it go. He will continue verbal threats, yelling across the room.

(*Id.*)

On October 9, 2013, Panyia Ly, one of claimant's teachers, completed a teacher questionnaire. (*Id.* 219–26.) She assessed the claimant to have no problems acquiring and using information, moving and manipulating objects, and raised no concerns with respect to the claimant's health and physical well-being. (*Id.* 220, 223, 225.) Ms. Ly indicated that the claimant had mild problems in attending and completing tasks, mild to moderate problems interacting and relating with others, and mild to moderate problems caring for himself, based largely on his inability to handle frustration and be patient. (*Id.* 221, 222, 224.)

On January 24, 2014, Lacy Fisher, a learning disabilities teacher, administered the Woodcock-Johnson Tests of Achievement to assess the claimant's academic capacities.

(*Id.* 557–58.)  The test indicated that the claimant's academic tasks generally fall within the average range, although claimant demonstrated "fluency with academic tasks" in the low range, and broad reading skills in the low average range.  (*Id.* 558.)  As part of the assessment, Ms. Fischer also commented on the claimant's behavior while being evaluated.  (*Id.*)  In particular, Ms. Fischer noted that he was "quite comfortable . . . and came willingly."  She also noted that he "worked hard and was very cooperative."  (*Id.*)

On February 4, 2014, the claimant was observed pushing another student while waiting in the lunch line.  (*Id.* 562.)  The claimant was removed from the line, and taken to the behavior coach's office, lunch in tow.  (*Id.*)  While the behavior coach was attempting to make a phone call, the claimant fled to his classroom where he proceeded to slam desks, throw boots, and mumbled to himself.  (*Id.*)  He would not return to the behavior coach's office when asked by school staff.  (*Id.*)  He then joined a line for the library with his peers.  (*Id.*)  When school staff approached, he flailed his arms and legs and tried to bite them. (*Id.*)  He was eventually escorted back to the behavior coach's room, where he stood in a corner and cried.  (*Id.*)  After approximately twenty minutes, he sat at a table and finished his lunch.  (*Id.*)  As part of this report, it was also noted that "[h]is self-care skills are age appropriate with adult reminders."  (*Id.* 563.)

On February 12, 2014, the claimant was evaluated again by Ms. Kallevang who administered a Kaufman Assessment Battery for Children-11 test.  (*Id.* at 556.)  Ms. Kallevang found that the test results fell within the average range and that "[h]e put forth good effort and attention through this assessment therefore results are considered a valid estimate of his abilities."  (*Id.*)

On April 10, 2014, Emily Mobeck, the claimant's teacher completed a questionnaire.  (*Id.* 574–80.)  She rated the claimant in six areas of functioning: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving and manipulating objects; 5) caring for himself; and 6) medical conditions and physical well-being.  (*Id.*)  Ms. Mobeck noted no problems acquiring, using information or moving and manipulating objects, and physical well-being.  (*Id.* 574, 577, 579.)  With respect to attending and completing tasks, Ms. Mobeck identified mild to medium problems in this area, the most problematic being the claimant's inability to change from one activity to another without being disruptive.  (*Id.* 575.).  (*Id.*)  Ms. Mobek assessed the claimant to have the most difficulty interacting with others.  (*Id.* 576.)  She rated the claimant's ability to play cooperatively with others and to express his anger appropriately as the most serious problems, although she listed the frequency of these concerns as "weekly."  (*Id.*)  Other problem areas, such as respecting authority, were encountered daily, but were considered less problematic on the whole. (*Id.*)  With respect to caring for himself, Ms. Mobek assessed the claimant to have the most serious problems handling frustration appropriately and using appropriate coping skills in the school environment.  (*Id.* 578.)  But again, these were encountered only weekly.  (*Id.*)  Aspects related to caring for his physical needs, taking care of personal hygiene, and taking his medications were not reported as areas of concern.  (*Id.*) Ms. Mobek also noted that his behavior was controlled when he took his medication. (*Id.* 579.)

On December 11, 2014, another of the claimant's teachers, Kathryn Lewandowski, completed a childhood disability evaluation form. (*Id.* 592–94.) Ms. Lewandowski provided her assessment on the same six functional areas. (*Id.* 592.) Ms. Lewandowski stated there was no evidence of limitations on acquiring and using information, moving about and manipulating objects, caring for himself, and health and physical well-being. (*Id.*) She believed that claimant experienced "marked" limitations, however, in attending and completing tasks, and "extreme" limitations in interacting and relating with others. (*Id.*) In support of these assessments, Ms. Lewandowski wrote that the claimant

> Has a difficult time relating to other people in the school setting. He currently attends school in a center-based special education program for students with emotional/behavioral disabilities. [The claimant] benefits from close adult proximity to keep him safe and focused. He demonstrates a low frustration tolerance and low stamina for academic tasks, though his capabilities are grade level. He is quick-witted and makes many attempts to manipulate those around him to get access to preferred people or activities. [The claimant] has a difficult time accepting adults' authority, particularly if it is an adult with whom he is not familiar or does not have a relationship. [The claimant] does respond to limits and logical consequences but often needs an adult with whom he is comfortable to process these consequences.

(*Id.* 593.) Ms. Lewandowski based her assessments on direct observation and treatment, her own experiences and background, and the various special education evaluations conducted by the school. (*Id.* 594.)

On March 27, 2015, Ms. Lewandowski completed another teacher questionnaire. The answers provided were substantially similar to other questionnaires concerning the claimant's impairments. For instance, Ms. Lewandowski opined that the claimant had no issue acquiring and using information; had mild problems attending and completing

tasks; moderate problems interacting and relating with others, the most serious of these issues stemming from his ability to play cooperatively with others, expressing anger appropriately, and respecting adult authority; no issues moving about and manipulating objects; moderate problems caring for himself, including handling frustration, being patient, and responding appropriately to changes in mood, although again having no issues with personal hygiene or caring for his physical needs; and no issues with respect to his physical health and well-being. (*Id.* 280–85.) Ms. Lewandowski noted in the report that school staff "notice a difference frequently from morning to afternoon with his focus and attention. On days when he has his morning medication, he is much better able to concentrate and complete tasks appropriately." (*Id.* 281.) Ms. Lewandowski also remarked that the claimant's afternoon behavior after he has taken his medication "is consistently more controlled than his morning behaviors." (*Id.* 285.) Consequently, Ms. Lewandowski questioned whether representations that the claimant was being given his morning dosage of his medication were "actually the case." (*Id.*) Specifically, Ms. Lewandowski noted that Plaintiff "reports she sometimes does not give him his morning medication, but she has not wanted us to administer it at school." (*Id.*)

In a January 29, 2016, behavior intervention plan, it was noted that the claimant needed as many as six breaks in the morning in order to stay on task. (*Id.* 364.) In the afternoon after taking his medication, it was reported that the claimant may need no more than one break. (*Id.*)

On March 6, 2017, Staci Anne Docken, a school psychologist at the Vadnais Heights Elementary School, issued a report pertaining to various tests administered to the

claimant and observations of the claimant while at school. (*Id.* 714–28.) Tests included the Kaufman Assessment Battery for Children-II, a Woodcock-Johnson IV Test of Achievement, a Behavior Assessment System for Children-3. (*Id.* 714–19.) Results of these tests were largely consistent with similar tests that were administered to the claimant at other schools: the claimant's intellectual function was largely in the average range, *see, e.g.*, (*id.* 714–716), and his behavioral tests indicated problems with attention and anger management. (*Id.* 717–18.)

As part of this report, Sarah Kolman-Keen, one of the claimant's special education teachers, was interviewed. (*Id.* 724.) She reported that the claimant "can be very polite and helpful," and "likes to be around his peers and typically plays well with them." (*Id.*) Ms. Kolman-Keen was most concerned with the claimant's "ability to regulate his emotions," because "[w]hen he gets frustrated, he escalates very quickly, and it is not always predictable." (*Id.*) Ms. Kolman-Keen also described that "[i]t can take [the claimant] anywhere from 10 minutes to an hour to de-escalate and process with an adult." (*Id.*)

With respect to in-class observations, it was noted in one twenty-five-minute observation during his regular class that the claimant was on task only 18% of the time. (*Id.* 725.) In another twenty-five-minute observation in his regular class, the claimant was on task 52% of the time. (*Id.*) In a smaller setting, "there were no instances of the target behavior observed. (*Id.*) [The claimant] was on task 80% of the time compared to a peer who was on task 60% of the time." (*Id.*) To achieve these results, the claimant

"required a [paraprofessional] in close proximity who gave him a high rate of verbal praise to participate and remain on task during [the] small group lesson." (*Id.* 726.)

### c. State Agency Consultant Opinions

In a report dated May 4, 2014, Margaret Getman, PhD, LP, opined that claimant's impairments did not meet a listing nor were his impairments functionally equivalent to any of the listings. (*Id.* 102–04.) In support of these findings, Dr. Getman assessed the claimant to have less than marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks; marked limitations in interacting and relating with others; no limitations in moving about and manipulation of objects; less than marked limitations in caring for himself; and less than marked limitations for health and physical well-being, premised primarily on the claimant's asthma.[5]

In a report dated July 8, 2014, Jenna Hutchinson, PhD, Psych, also opined that the claimant's impairments did not meet a listing nor were his impairments functionally equivalent to a listing. (*Id.* 90–91.) In support of these findings, Dr. Hutchinson assessed the claimant to have no limitations in acquiring and using information; less than marked limitations in attending and completing tasks; less than marked limitations interacting and relating with others; no limitations with respect to moving about and manipulating

---

[5] This portion of the state agency report was prepared by Sagit Rosenberg, MD, whose specialty is pediatrics. (R. 103–04.)

objects, less than marked limitations caring for himself, and less than marked limitations for health and physical well-being premised primarily on the claimant's asthma.[6]

## II.    DISCUSSION

### A.    Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). That said, the Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

### B.    Analysis

Plaintiff challenges the ALJ's determination as to Listing 112.11. *See generally* (Pl.'s Mem. in Supp.) More specifically, Plaintiff argues that the ALJ failed to consider

---

[6] This portion of the state agency report was prepared by Milford Schwartz, MD, whose specialty is pediatrics. (R. 91.)

certain information when addressing the questions of whether the claimant's impairments met or were medically equivalent to the Listings or were functionally equivalent to the Listings. *See, e.g.*, (*id.* 1, 19–28.) Furthermore, Plaintiff argues that the ALJ "cherry-picked" the record to support his assessments as to each issue. *See, e.g.*, (*id.*)

For the reasons described in the following discussion, the Court concludes that remand is not warranted because although the ALJ erred in the manner in which he analyzed the issue of functional equivalence to the Listing, substantial evidence in the record supports the ALJ's ultimate conclusion that the claimant is not disabled.

The ALJ first analyzed the claimant's impairments under Listing 112.11. When the ALJ concluded that the impairments did not meet or medically equal Listing 112.11, he was then required to consider whether the claimant's impairments were functionally equivalent to Listing 112.11. *See, e.g.*, 20 C.F.R. §§ 416.924–926. The determination of whether the claimant's impairments met or medically equaled Listing 112.11 or of whether the claimant's impairments were functionally equivalent to Listing 112.11 involves consideration of essentially the same record evidence. For example, under a paragraph B analysis[7] of Listing 112.11, the ALJ must consider whether the impairments impact a claimant's ability to "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself" and, if so, the severity of those limitations. 20 C.F.R. part 404, Subpt. P, App. 1, part B § 112.11. In a functional equivalence analysis, the ALJ must consider whether and to what extent the

---

[7] The Plaintiff does not argue that the ALJ erred in the manner in which he conducted his paragraph A or paragraph C analysis under Listing 112.11.

impairments impact any of the following functional domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1).

### 1. Analysis Under Paragraph B

Turning first to the ALJ's paragraph B analysis, the ALJ concluded the claimant had mild limitations in the areas of understanding, remembering or applying information; marked limitations in interacting with others; moderate limitations in concentrating, persisting, or maintain pace; and moderate limitations in adapting or managing oneself. (R. 26–28.)

Plaintiff's arguments focus primarily on the ALJ's determinations concerning concentration, persistence and pace, and adapting or managing oneself. (Pl.'s Mem. in Supp. at 19–24.) As to concentration, persistence, and pace, Plaintiff asserts that the ALJ failed to consider critical evidence and points to several teacher interviews (e.g., one by Ms. Ly) and the notes of two twenty-five-minute observations in support of her position that the claimant is more impaired than the ALJ concluded. (*Id.* 21–22.)

While it is true that the ALJ did not specifically reference this information *in this portion of his decision*, the Court concludes this is, at most, a deficiency in opinion-writing. The ALJ conducted a thorough analysis of the claimant's ability to maintain concentration, persistence, and pace in the context of the subsequent functional equivalency analysis, when he discussed the claimant's ability to attend to and complete tasks, so it is clear the ALJ was aware of and took note of this evidence. *Compare*

(R. 27–28, *with* R. 32–33.)  Furthermore, Plaintiff's argument relies on the false premise that the ALJ's failure to mention certain information necessarily means that he failed to consider it.  *Cf. Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered" (internal quotation marks omitted)).  Given the detail with which the ALJ discussed the record generally throughout his decision,[8] it is "unlikely that the ALJ did not consider and reject" the evidence Plaintiff cites in support of her argument that he should have found the claimant to be disabled.  *Id.*

As for the ALJ's determination that the claimant had only moderate limitations in adapting or managing oneself, Plaintiff's arguments that the ALJ failed to consider significant information are likewise unpersuasive.  For example, the ALJ considered numerous opinions from his teachers on this issue, some demonstrating more than moderate limitations, but discounted them in part because they were inconsistent with other record evidence, and because they resulted at least to some extent from the inconsistency in administering the claimant's morning medication.  *See, e.g.*, (*id.* 28.)  Additionally, as with the ALJ's determination about concentration, persistence, and pace, the ALJ conducted a thorough analysis of the claimant's limitations in adapting or managing oneself in the context of his discussion of claimant's ability to care for himself.

---

[8]  For instance, the ALJ discussed the questionnaire of Ms. Ly in connection with the claimant's ability to attend to and complete tasks.  *See* (R. 32.)  Furthermore, while the ALJ did not specifically mention it in this portion of his analysis, the ALJ elsewhere specifically cited test results in which the individuals administering the tests reported the claimant worked hard and demonstrated appropriate concentration in taking the evaluations.  *See, e.g.*, (R. 556, 558.)

*Compare* (*id.* 27–28, *with id.* 38–40.)  As a result, the Court does not agree with Plaintiff

that the ALJ failed to construct a "logical bridge" between the record evidence and his

conclusions.[9]  *Cf.* (Mem. in Supp. at 25–26.)  Consequently, the Court is satisfied that the

ALJ's determination as to the paragraph B analysis is supported by substantial evidence

in the record as whole.

### 2.    Functional Equivalency Analysis

Plaintiff argues that the ALJ's analysis with respect to functional equivalence was

deficient because the manner in which the ALJ reached the conclusion that the claimant

had no limitations in the domain of caring for himself was contrary to the established

regulations and guidelines and not supported by substantial evidence in the record as

whole.

In reaching his conclusion as to this domain, the ALJ appeared to give particular

weight to evidence relating to the claimant's ability in areas such as personal hygiene,

dressing himself, etc.  For example, the ALJ stated the claimant "had no problems with

taking care of personal hygiene." (*Id.* 38.)  The ALJ also relied on statements from the

Plaintiff that the claimant was required to put his clothes away, take his dog out and take

out the trash." (*Id.* 38–39.)  Furthermore, the ALJ pointed to Plaintiff's testimony that

the claimant "could dress himself, comb his hair, and tie his shoes." (*Id.* 39.) The ALJ

gave great weight to Dr. Lace's opinion that the claimant had no limitations is the area of

---

[9] "This is a minimal articulation standard."  *Jacobs v. Astrue*, No. 09-cv-431 (JMR/JJK), 2009 WL 943859, at *3 (D. Minn. Apr. 6, 2009) (Keyes, Mag. J.)  Nothing in the ALJ's decision suggests that he failed to meet this standard.

caring for himself, in part because "other medical providers not[ed] no issues in personal hygiene." (*Id.* 40.) Conversely, the ALJ gave little weight to the claimants' teachers' opinions that the claimant had serious limitations in this functional domain due to his inability to handle his frustrations properly, be patient when necessary, and respond appropriately to changes in mood, on the ground that the ALJ had addressed those concerns instead in his "findings of Attending and Completing Tasks and Interacting and Relating to Others as they appear to be closely related to claimant's ADHD diagnosis and treatment." (*Id.*)

The Court agrees with Plaintiff that the ALJ's analysis as to this functional domain was not consistent with the regulations, and that the ALJ incorrectly relied upon certain evidence of record and improperly ignored other evidence in reaching his conclusion. Notably, 20 C.F.R. § 416.926a(k)(3) states that for school-aged children, one aspect of caring for oneself is that "[y]ou should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you." SSR 09-7P provides further guidance as to this regulation, stating that

> the domain of "Caring for yourself" does *not* address children's physical abilities to perform self-care tasks like bathing, getting dressed, or cleaning up their room. We address these physical abilities in the domain of "Moving about and manipulating objects" and, if appropriate, "Health and physical well-being." Nor does it concern the ability to relate to other people, which we address in the domain of "Interacting and relating with others." Rather, in "Caring for yourself," we focus on how well a child relates to self by *maintaining a healthy emotional . . . state* in ways that are age-appropriate and in comparison to other same-age children who do not have impairments.

(emphasis added). SSR 09-7P goes on to state

The domains of "Caring for yourself" and "Interacting and relating with others" are related, but different from each other. The domain of "Caring for yourself" involves a child's feelings and behavior in relation to self (as when controlling stress in an age-appropriate manner). The domain of "Interacting and relating with others" involves a child's feelings and behavior in relation to other people (as when the child is playing with other children, helping a grandparent, or listening carefully to a teacher).

*Id.* The Court finds the ALJ's reliance on the claimant's ability to perform self-care tasks (e.g., dressing himself and attending to his hygiene) while ignoring the claimant's ability to self-regulate his emotional needs (e.g., managing his own frustration levels, being patient, and responding appropriately to changes in mood), was an erroneous application of the regulations.

When the proper evidence is considered in applying 20 C.F.R. § 416.926a(k)(3) and SSR 09-7P, the Court concludes that the ALJ's conclusion that the claimant suffered from "no limitations" in the functional domain of "caring for oneself" is not supported by substantial evidence in the record. For example, the record discusses numerous instances when the claimant took tens of minutes to an hour to calm himself after an altercation at school. *See, e.g.*, (R. 300, 724.) This evidence is inconsistent with someone who has "no limitations" in controlling his emotions. *Cf.* 20 C.F.R. § 416.926a(k)(3). Furthermore, many of his teachers raised this functional domain as a concern, and considered it be a mild or moderate impairment. *See, e.g.*, (*id.* 224, 284, 578.) These opinions were consistent with those of the state agency consultants who opined that the claimant has "less than marked" limitations in this functional domain. *See, e.g.*, (*id.* 91, 103.) The ALJ's conclusion is also inconsistent with his own finding in the context of his paragraph

B analysis that the claimant had moderate limitations in the area of adapting or managing oneself.[10]  *See* (*id.* 27.)

Having identified an error that rises above a mere deficiency in opinion-writing, the next question is whether the matter must be reversed and remanded to the ALJ.  In *Brown v. Colvin*, the Eighth Circuit held that "the ALJ's failure to identify and analyze the appropriate [factors], although error, may not be itself require reversal so long as the record otherwise supports the ALJ's overall conclusion."  825 F.3d 936, 940 (8th Cir. 2016) (citing *ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008)  In *Brown,* the Eighth Circuit remanded the case to the ALJ for further proceedings because the ALJ's decision had not adequately accounted for the inconsistencies in the medical evidence, making it impossible for the court to tell whether substantial evidence supported the ALJ's finding.

Here, however, the ALJ thoroughly discussed the evidence of record, and adequately addressed the inconsistencies in the evidence.  *See generally* (R. 19–48.). Accordingly, the Court can assess whether the record supports the ALJ's overall conclusion and finds here that the ALJ's ultimate determination on the claimant's disability status is supported by substantial evidence in the record as a whole.

Of particular importance in this regard is the evidence throughout the record that the claimant did not regularly and consistently receive his medication, particularly in the

---

[10]  As detailed above, the Court concluded the ALJ's decision as to whether the claimant's impairments met or medically equaled Listing 112.11 was supported by substantial evidence.

morning. The ALJ properly considered that evidence in analyzing the extent to which the claimant was or was not limited in the domain of caring for himself. (R. 38–40.) In addition, the ALJ considered the evidence that the medication—when taken at appropriate intervals—made a material difference in the claimant's emotional control. *See* (*id.*); *accord* (R. 281, 285, 512, 548, 550–51, 584, 588–89, 616–17, 653.)

The Eighth Circuit has observed that "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (internal quotation marks omitted). The instant case is distinguishable from the facts in *Tate v. Apfel*, 167 F.3d 1191 (8th Cir. 1999), where there was no evidence in the record that the impairment could be managed through medication. *Cf.* 167 F.3d at 1197. Here, the record is replete with statements by Plaintiff, the claimant, his teachers, and medical professionals that the medication helped him regulate his emotions and improved his concentration, but that Plaintiff did not always administer the claimant's medication as instructed. *See, e.g.*, (R. 281, 285, 512, 548, 550–51, 584, 588–89, 616–17, 653.) Furthermore, unlike in *Pate–Fires v. Astrue*, 564 F.3d 935, 945–47 (8th Cir. 2009), the record reflects that the claimant's impairments are not the *cause* of his medical non-compliance.[11] *See, e.g.*, (*id.* 512 (stating that the claimant "asks for the medication").)

---

[11] The ALJ also discussed the claimant's irregular attendance with scheduled therapy sessions. *See, e.g.* (R. 40.) While the ALJ appeared to put more emphasis on the non-compliance with prescribed medication, *see, e.g.*, (R. 39–40), noncompliance with *any* prescribed treatment, including attendance at therapy, may also support the ALJ's conclusion that claimant is not disabled. *Cf. Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004).

For these reasons, although the claimant does not have "no limitations" in the functional domain of caring for himself, the Court is satisfied that substantial evidence supports the ALJ's ultimate conclusion that the claimant does not have the requisite *marked* limitations in this functional domain, and therefore the ALJ's determination that the claimant is not disabled is supported by substantial evidence in the record as a whole.

## III. CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Delores J.'s Motion for Summary Judgment [Doc. No. 14] on behalf of Q.J.J., Jr. is **DENIED**; and

2. The Acting Commissioner of Social Security's Motion for Summary Judgment [Doc. No. 16] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 19, 2019          s/ *Hildy Bowbeer*
                                 HILDY BOWBEER
                                 United States Magistrate Judge